IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ARLENE DELGADO,<br><br>Plaintiff,<br><br>v.<br><br>CHAEL SONNEN, *et al.*,<br><br>Defendants. | ) | Case No. 1:24-cv-1690-JGLC-JW |

**PLAINTIFF'S OPPOSITION TO CHAEL SONNEN'S**
**<u>MOTION TO DISMISS AND MEMORANDUM IN SUPPORT</u>**

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 8

*BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172 (S.D.N.Y. 2018)) ....... 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 8

*Bender v. City of New York*, 78 F.3d 787 (2d Cir.1996) ........ 23

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015) ........ 22

*Carroll v. Trump*, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ........ 11

*Carroll v. Trump*, 20-cv-7311 ........ 11

*Carroll v. Trump*, 22-cv-10016 (LAK) ........ 11

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000) ........ 10, 21-22

*Coleman v. Grand*, 523 F. Supp. 3d 244 (E.D.N.Y. 2021) ........ 20, 21

*Cummings v. City of N.Y.*, 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ........ 9

*Cummins v. Suntrust Capital Mkts., Inc.*, 649 F. Supp. 2d 224 (S.D.N.Y. 2009) ........ 20

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) ........ 21

*Davis v. Boeheim*, 22 N.E.3d 999 (N.Y. 2014) ........ 12

*DeFilippo v. Xerox Corp.*, 223 A.D.2d 846 (1996) ........ 14

*DiBlanca v. Town of Marlborough*, 2014 WL 2866341 (N.D.N.Y. June 24, 2014) ........ 25

*Eros Intern. PLC v. Mangrove Partners*, 2019 WL 1129196 (Sup. Ct., N.Y. Cnty. 2019) ........ 15

*Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223 (S.D.N.Y. 2023) ........ 25

*Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002) ........ 12

*Frank v. Nat'l Broad. Co., Inc.*, 119 A.D.2d 252 (1986) ........ 16

*Giffuni v. Feingold*, 299 A.D.2d 265 (2002) .......... 17

*Gilmore v. Jones*, 370 F. Supp. 3d 630 (W.D. Va. 2019) .......... 16

*Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280 (S.D.N.Y. 2023) .......... 17

*Goldhirsh Group. Inc. v. Alpert*, 107 F.3d 105 (2d Cir.1997) .......... 24

*Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970) .......... 19

*Held v. Pokorny*, 583 F. Supp. 1038 (S.D.N.Y.1984) .......... 17

*Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327 (S.D.N.Y. 2003) .......... 9

*Herbert v. Lando*, 781 F.2d 298 (2d Cir. 1986) .......... 15

*Horsley v. Rivera*, 292 F.3d 695,697 (11th Cir. 2002) .......... 19

*James v. Gannett Co., Inc.*, 353 N.E.2d 834 (1976) .......... 11

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998) .......... 15

*Kleeberg v. Sipser*, 191 N.E. 845 (1934) .......... 10

*Lee v. City of Rochester*, 174 Misc.2d 763 (Sup. Ct. Monroe Co. 1997) .......... 19

*Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123(2d Cir.1984) .......... 20

*Levy v. Gelber*, 25 N.Y.S.2d 148 (Bronx Co. 1941) .......... 11

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) .......... 22

*Lindberg v. Dow Jones & Co., Inc.*, 2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) .......... 8

*Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014) .......... 8

*McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174 (S.D.N.Y. 2020) .......... 14

*Moraes v. White*, 571 F. Supp. 3d 77 (S.D.N.Y. 2021) .......... 14, 24

*November v. Time, Inc.*, 194 N.E.2d 126 (N.Y. 1963) .......... 11

*N.Y. Times Co. v. Sullivan, 376 U.S. 254 (1964* .......... 21

*Palin v. N. Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019) .......... 10

*Partridge v. State of N.Y.*, 173 A.D.3d 86 (2019) ........................................................................ 15

*Penobscot Indian Nation v. Key Bank*, 112 F.3d 538 (1st Cir.1997)........................................... 20

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 253 F. Supp. 3d 705 (S.D.N.Y. 2014)......... 12

*Rich v. Fox News Network, LLC*, 939 F.3d 112 (2d Cir. 2019) .................................................. 23

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001)....................................................... 8

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ................................................................................ 9

*Salomone v. Macmillian Publ'g Co., Inc.,* 411 N.Y.S.2d 105 (Sup. Ct. NY 1978) ..................... 17

*Sandals Resorts Int'l, Ltd. v. Google, Inc.*, 86 A.D.3d 32 (1st Dept. 2011) ................................ 15

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 2012 WL 3569952 (Sup. Ct., New York Cnty. 2012) ........................................................................................................................................ 15

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290 (S.D.N.Y. 2017) ....... 19

*Solstein v. Mirra*, 488 F.Supp.3d 86 (S.D.N.Y. 2020)................................................................. 14

*St. Amant v. Thompson*, 390 U.S. 727 (1968)................................................................................ 21

*Stapleton Studios, LLC v. City of N.Y.*, 26 A.D.3d 236 (2006)................................................... 24

*Steele v. Goodman*, 382 F. Supp. 3d 403 (E.D. Va. 2019) ........................................................... 16

*Treppel v. Biovail Corp.*, 2004 WL 2339759 (S.D.N.Y.2004)............................................. 10, 11

*Triggs v. Sun Printing & Publ'g Assn.*, 71 N.E. 739 (1904) ....................................................... 17

*Trump v. Chi. Tribune Co.*, 616 F. Supp. 1434 (S.D.N.Y. 1985) ................................................ 17

*Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157 (1979) ..................................................... 19

*Yukos Cap. S.A.R.L. v. Feldman*, 2016 WL 4940200 (S.D.N.Y. Sept. 14, 2016) .......................... 8

**Rules**

Fed. R. of Civ. Proc. 12(b)(6) ............................................................................................... 8, 14

Fed. R. Evid. 201 ............................................................................................................................. 9

**Statutes**

16 O.R.S. § 163.732 .......... 13

N.Y. PEN § 240.26 .......... 13

**Other Authorities**

W. P. Keeton, Prosser & Keeton on the Law of Torts, § 112 (5th ed. 1984) .......... 13

Plaintiff, ARLENE J. DELGADO ("Delgado" or "Plaintiff"), by and through counsel, for her response and opposition the Motion to Dismiss (ECF 33) filed August 21, 2024 (the "Motion") by the defendant, Chael Sonnen ("Sonnen"), states:

## INTRODUCTION

This action arises out of the bewildering, unprovoked attack on Delgado by Sonnen, years after their personal friendship ended. In March of 2023, out of the blue, Sonnen, while serving as a guest on the Flagrant podcast, made numerous defamatory statements about Delgado, falsely claiming that she stalked him, so much so that she was banned from Ultimate Fighting Championship ("UFC") events and notices were placed at venues about her, that she fabricated her education and professional degree, and that she lied about her own name. The defamatory statements about Delgado were widely published and disseminated on various platforms, with the episode receiving millions of views on the podcast's YouTube show and channel. Sonnen's statements about Delgado, then published by Defendants Andrew Schulz and AlexxMedia, LLC, indisputably are false and defamatory.

Sonnen does not deny he made the Defamatory Statements, and does not claim they were true. Instead, unbelievably, Sonnen argues the statements cannot be actionable because he is a liar who lied. He also asserts that because he lied on a broadcast purported to be humorous, he cannot be held liable for his lies. But Sonnen cannot absolve himself from the damage he caused Delgado by framing his verifiably false statements of fact as mere "trash talk"—it is a well-settled principle that a person is not allowed to murder the reputation of another in jest. Moreover, Sonnen, by his own admission, intentionally interfered with Delgado's business relationship with the Trump Campaign by reaching out directly to the former President of the United States to secure Delgado's removal from her position. As alleged in the FAC, Sonnen's actions were intentional, extreme,

outrageous, and caused Delgado significant and severe emotional distress. The FAC alleges sufficient facts to plausibly state claims for defamation, intentional interference with prospective economic advantage, and intentional infliction of emotional distress. The Motion should be denied.

## WELL-PLED FACTS OF THE FIRST AMENDED COMPLAINT

Delgado is a graduate of Harvard Law School. First Amended Complaint ("FAC") ¶3. She worked as an attorney and General Counsel for a prestigious, non-profit organization. FAC ¶3. In 2016, Delgado was an advisor to the Donald J. Trump for President campaign ("Trump Campaign"), though she later became a critic of former President Trump ("Trump"). FAC ¶3. Sonnen is a well-known, retired mixed martial arts athlete, who fought in the UFC. FAC ¶4. He is a former Fox Sports analyst and a current analyst for the ESPN network. FAC ¶4. Defendant Andrew Schulz founded, records, directs, produces, hosts, and publishes "Flagrant," a popular weekly podcast with millions of viewers on YouTube (the "Podcast"). FAC ¶5. AlexxMedia also records, directs, produces, and publishes the Podcast. FAC ¶6.

Beginning in 2012, Sonnen and Delgado became friends and maintained a close platonic friendship. FAC ¶11. The two would communicate often and referred to one another by pet names—"buddy," or "Cha-Cha" (as Delgado called Sonnen) and "Harvard" as Sonnen called Delgado. FAC ¶16. Delgado and Sonnen first came into contact in 2011, when Delgado was writing an article about mixed martial arts and politics. FAC ¶12. Delgado sought to interview Sonnen for the article. FAC ¶12. Delgado sent Sonnen a 'tweet' on Twitter, asking to interview him and, minutes later, Sonnen, apparently seeing the tweet and reading Delgado's Twitter profile (which listed her alma mater), sent her a private "direct message" on Twitter, which read: "Did you really graduate from, H[arvard]?", to which Delgado responded, "To answer your question, it's 'yes,', of course! See link :)" and included a link to her New York State Bar listing. FAC ¶13.

Sonnen instantly sent her another direct message stating, in light of such, he would do the interview. FAC ¶14. Although they subsequently became close friends and maintained a friendship for close to a year, eventually the friendship between Delgado and Sonnen waned. FAC ¶17. As they grew apart, Sonnen pleaded with Delgado to remain friends, but the friendship ultimately fizzled out by late 2012. FAC ¶¶17-18, n.3.

According to Sonnen, Sonnen is a regular guest on the Podcast. FAC ¶24. On the March 7, 2023 episode of the Podcast, Sonnen was a featured guest. FAC ¶25. Throughout the episode, Sonnen, Schulz, and the other co-hosts engage in entertaining but also serious conversation on many topics. FAC ¶25. Two hours into the episode, Schulz asked Sonnen if he had any interesting stories to share with the Podcast's audience. FAC ¶25. Sonnen made the following statements:

> **Chael Sonnen:** I know a 'Catch Me If You Can.'[1] Yeah, I'm trying to think if I could tell the story, but yeah.
>
> **Akaash Singh:** Please do.
>
> **Andrew Schulz:** Wait, wait, what do you mean?
>
> **CS:** Well, I can't tell... Alright, let me be a real scumbag. Let me-let me-let me be a jerk and then go, "But I can't tell ya."
>
> **AS:** Bad guy.
>
> **CS:** A President of the United States, in their absolute inner circle, had a phony, and I knew the phony. And I knew the phony because the phony had come after me and it got all the way to the chief legal officer of the Ultimate Fighting Championship that had to put a notice at every venue that we went to, to ban this person who was stalking me, and that person was on the inner circle of a President [elect] of the United States. So I have to reach to the president, of which I don't know, to let them know that this human being is not who they're claiming they are, and they're getting ready to set you up. Not to mention, you're going to look like a fool when it comes out that this person is not named, does not have the title, and did not go to the school that you're running around Hannity and Colmes and telling them that they are. And I did. I got it to the president who removed this person and then on Christmas Day...

---

[1] "Catch Me If You Can" refers to the title of a well-known 2002 film starring Leonardo DiCaprio, in which the protagonist obtains money by fraudulent means by creating false identities as a lawyer, doctor, and airline pilot.

**AS:** Who did Trump remove? Who did...

**CS:** Her. She was going to the [various beeps inserted by the podcast] that [she] was a Harvard graduate, *law school*--

**AS:** How was she stalking you?

**CS:** --and she was a continual guest on Hannity and O'Reilly. It was O'Reilly at the time. That was not her name. She did not have a law degree. She did not go to Harvard. And so I gotta notify the... You got her in your inner circle, on your *jumbo jet*. Which only has six people, and you got *her*. That's not her name, she's... Yeah. It was a whole thing.

**AS:** How was she stalking *you*?

**CS:** Then she comes in on Christmas Day, they make... You know what… you should probably just do the investigation from there, I think... On Christmas Day, it comes out that she had been--

**AS:** I love that. He's so good.

**Alexx Media:** I know, I know.

**AS:** So good.

**CS:** --she had been impregnated, but they dropped this on Christmas Day, so it's Christmas morning when this comes out, but she had been impregnated by the, [guy] who was going to be the speaker, who had already been giving the job to be speaker but it's Christmas Day, and yeah, this doesn't kick in until it was like January 19th or 20th.

**AS:** Speaker of the House?

**CS:** No, speaker, like a press secretary.[2] That's what I'm trying to say.

**AS:** Okay. Yeah.

**CS:** Yeah. No, it was a mess. Man. The whole thing was a mess.

**S5:** Did she have a brother named George Santos?

**CS:** That's an interesting one. What do you think they should do with him?

**AM:** I don't know, really.

---

[2] Sonnen meant the White House Communications Director but confused it with the highly similar role, announced the same day, of Press Secretary.

**CS:** Nothing.

**AM:** Why?

**CS:** What's the difference in what he did?...

(together with the other alleged statements, the "Defamatory Statements"). FAC ¶25.

The Defamatory Statements undisputedly refer to Delgado. FAC ¶26. Delgado was, at the time referenced by Sonnen, the only Senior Advisor to the Trump Campaign who was a graduate of Harvard Law. FAC ¶26. Delgado's Harvard degree was often highlighted when she made appearances on behalf of the Trump Campaign. FAC ¶26. It also was known that Delgado travelled with Trump on his private jet and was, at that time, a member of Trump's inner circle. FAC ¶26. It also was publicly revealed on Christmas Day of 2016 that Delgado was pregnant and having a child fathered by Jason Miller, a Trump Campaign spokesperson who was then to be named White House Communications Director. FAC ¶26. Given these specific identifying facts, there could be no other person to whom Sonnen was referencing in his statements and it was exceedingly clear to whom Sonnen was referring. FAC ¶26.

The Defamatory Statements are verifiably false. Specifically, Delgado is not and never has been a phony in the manner portrayed by Sonnen. FAC ¶27. She never has lied about her background, education, or professional experience, to Sonnen, Trump, the Trump Campaign, or anyone else. FAC ¶27. She never has stalked Sonnen. FAC ¶27. The UFC never put up "notice[s]" about Delgado at UFC venues or anywhere. FAC ¶27. She never was banned from UFC events and she never was "getting ready" to "set up" Trump. Delgado's name is and always has been Arlene Delgado. She has never misrepresented her name. FAC ¶27. Sonnen knew her name as "Arlene," and not any other name (as reflected in the voicemails messages he left for Delgado). FAC ¶27. Delgado attended and graduated from Harvard Law School. FAC ¶27. Delgado has a

law degree FAC ¶27. Delgado is listed on the New York State Attorney's website, accessible to the public, as having a law degree; as a member of the New York State Bar; and as having a degree from Harvard Law School. FAC ¶27. Delgado provided a link to this information in her first interaction with Sonnen. FAC ¶27. This information is also found in multiple articles about Delgado and on the internet. FAC ¶27. Aside from Sonnen's statements and people repeating them, there is no contrary information anywhere. FAC ¶27.

Given their history as personal friends and the information Sonnen had available to him at the time he made the Defamatory Statements, Sonnen actually knew the Defamatory Statements were false or, at best, acted with reckless disregard as to the truth or falsity of the Defamatory Statements. The Defamatory Statements were published on various platforms, including to the Podcast's millions of YouTube subscribers. FAC ¶28. Even the description of the relevant segment of the Podcast—identified as *"Chael knew there was a phony in the President's inner circle"*—is defamatory. FAC ¶30. Aside from a single "beep" within the segment, there is no censoring or obscuring of the multiple references identifying Delgado as the party to whom the Defamatory Statements refer. FAC ¶30. Media outlets reported the Defamatory Statements as true. FAC ¶31. Delgado has been vilified on social media. FAC ¶31. A Substack article also was written about the Defamatory Statements and identified Delgado as the individual to whom the Defamatory Statements referred, crediting "Uncle Chael" for outing "fraudster" Delgado; for outing the name Arlene Delgado is a "fake alias"; and adding she is probably not even really Latina. FAC ¶31, n.9. Sonnen's fans also publicly identified Delgado as the subject of the Defamatory Statements and amplified them, referencing Delgado specifically and attacking Delgado's character. FAC ¶31. (*See, e.g.*, Attachment G to the original Complaint).

Delgado received various attacks on social media following the publication of the Podcast

and Defamatory Statements. FAC ¶32. When Delgado discovered the Defamatory Statements, she was distraught. FAC ¶36. She immediately made numerous attempts to contact individuals responsible for the Podcast. FAC ¶36. She sought to have the Podcast taken down and the Defamatory Statements retracted, but her efforts were ignored. FAC ¶¶37-47. Sonnen knowingly made the Defamatory Statements about Delgado during the recording of the Podcast to Schulz and other guests and co-hosts of the Podcast, with the knowledge it would be published on AlexxMedia's various platforms, including YouTube, to millions of listeners. FAC ¶46. The Podcast recording was not edited or censored to remove identifying information. FAC ¶46.

Sonnen has a long, documented history of attacks on minorities which likely motivated, in whole or in part, his unprovoked attack of Delgado. FAC ¶¶20, n.4, n.5, 48. Delgado is a Latina, with a clear Hispanic accent. FAC ¶48. Upon information and belief, the Defamatory Statements may also have been motivated as a way for Sonnen to curry favor with Trump and actors in the Trump orbit. FAC ¶49. Sonnen is an admirer of Trump, and dabbles in political commentary, and Delgado has been engaged in a lawsuit against the Trump Campaign since 2019, and in a family court matter filed by Jason Miller, a long-time and top-ranking Trump advisor. FAC ¶49. Based on social media posts, it appears Sonnen and Miller may even be collaborating to discredit Delgado as punishment for suing the Trump Campaign or to damage her in the pending family law case with Miller. FAC ¶49. In addition, the Defamatory Statements appear to have been made to punish Delgado for her years-old criticism of Sonnen's racially charged remarks on social media, as well as the ending of their friendship, and to cause damage to Delgado personally and professionally. FAC ¶¶21, 50. Due to Sonnen's prior friendship with Delgado, and his private knowledge of Delgado, Sonnen unmistakably knew the Defamatory Statements to be false when they were made and published. FAC ¶50. By falsely accusing Delgado of dishonest and unethical behavior,

Sonnen, Schultz, and AlexxMedia thrust Delgado – now a private individual – into public contempt, hatred, ridicule, aversion, and disgrace within the community. FAC ¶59. The Defamatory Statements were made and published for the purpose of impugning Delgado's reputation, with no honest belief in the truth of the statements and were made with the intent to harm Delgado for Sonnen's own personal bias or gain or as a vendetta against Delgado. FAC ¶¶60-61. Additionally, Sonnen intentionally interfered with Delgado's business relationships, according to Sonnen's admission successfully interfering with her economic relationship with the Trump Campaign. As a result of the actions of Sonnen, Schultz, and AlexxMedia, Delgado suffered and continues to suffer damages. FAC ¶¶62-63.

## <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need only plead "'enough facts to state a claim to relief that is plausible on its face.'" *Lindberg v. Dow Jones & Co., Inc*., 2021 WL 3605621, *3 (S.D.N.Y. Aug. 11, 2021) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible "when the factual content pleaded allows a federal court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Yukos Cap. S.A.R.L. v. Feldman*, 2016 WL 4940200, *2 (S.D.N.Y. Sept. 14, 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014).

## <u>PERTINENT LEGAL AUTHORITIES AND ARGUMENT</u>

### *A. The Court Should Not Consider Material Outside of the First Amended Complaint*

In general, in resolving a motion to dismiss under Rule 12(b)(6), a court may consider only the allegations on the face of the complaint and the materials it attaches. *See Robinson v. Gov't of*

*Malaysia*, 269 F.3d 133, 141 n.6 (2d Cir. 2001). The court may however permissibly consider extrinsic materials where such are incorporated by reference or where a document is one "upon which [the complaint] solely relies and which is integral to the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).[3] For a document to be incorporated by reference, the complaint must make a "clear, definite and substantial reference to the document[ ]." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003).

Here, Sonnen attempts to spin the narrative, cherry picking alleged "facts" and information not incorporated in or integral to the FAC. For example, the Motion cites to numerous websites and online articles not found anywhere in the FAC.[4] *See, e.g.* Motion at n.2, n.5., n.6, n.7. n.8, n.9, n.11, n.12, 16, 22. These websites and articles are unauthenticated, unverified and, largely, contain rank inadmissible hearsay. Likewise, the Motion references unverified, largely irrelevant, often incorrect "facts" not incorporated in, referred to, or relied upon anywhere in the FAC.[5] Sonnen

[3] *See also Cummings v. City of N.Y.*, 2020 WL 882335, *3 n.2 (S.D.N.Y. Feb. 24, 2020) ("In reviewing a motion to dismiss, a court may consider, inter alia, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint without converting the motion to dismiss to a motion for summary judgment." (quoting *BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018)).

[4] Under Fed. R. Evid. 201, a court may judicially notice a fact that is not subject to reasonable dispute. The type of facts that may be judicially noticed include, facts that are (1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). "Central to Rule 201 ... is the notion that federal courts take judicial notice of facts, not documents." *In re Manning*, 620 B.R. 199, 207 (W.D.N.Y. 2020).

[5] *See, e.g.* Motion at 1 ("'Flagrant' ('Video') that epitomizes 'Bro Culture' comedy.'"); 3 ("Plaintiff is a nationally known political commentator, writer…"), 4 ("Delgado began an affair with Jason Miller, a high ranking spokesperson for Donald J. Trump…The acrimony spilled into public view shortly thereafter on Christmas Eve 2015, when Delgado chose to respond to Miller's widely reported appointment as White House communications director …"); 4 ("DELGADO was at all times relevant herein embroiled in 2 long running high profile and acrimonious cases arising out of her time with the Trump campaign and transition team."); 4-5 ("In an area of law known for ugly allegations, sharp litigation practices and high stakes public relation campaigns this case stands out….); 5 (generally describing Delgado's 2019 case filed against the Trump Campaign for pregnancy discrimination); n.10 ("Sonnen who fought in a metal cage for over 21 years was regularly kicked in the head, punched in the face and placed into chokeholds. 7 of his losses were by knockout."); 6 ("In entertainers Sonnen has established himself as a draw for making audacious statements and fanciful antidotes. Within the world of [UFC], Sonnen is renowned for his trash-talking and flights of fancy."); 6 ("The creators of Flagrant describe it as a comedy podcast …); 12 ("Sonnen an acknowledged MVP of trash talking and spinner of tales …."); 12 ("Fans of Flagrant…A **hole Infantry, A **hole

asserts the Court can take judicial notice of these "facts" and information. But these are not the type of facts and information "whose accuracy cannot reasonably be questioned" and Sonnen has not met his burden to show such accuracy. *Citgo Petroleum Corp.*, 2023 WL 7547441 at *5. Accordingly, in ruling upon the Motion, the Court should disregard all referenced facts, information, and documents not incorporated or relied upon in the FAC.

*B. The Defamatory Statements are actionable.*

Under New York law, to state a claim for defamation, a plaintiff must allege "(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N. Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). A statement will qualify as defamatory *per se* if it "affect[s] a person in [her] profession, trade, or business by imputing to [her] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (citation omitted). Thus, some statements are inherently actionable defamation per se because they discredit one in her chosen calling, including, for example, referring to an attorney as a "shyster." *Treppel v. Biovail Corp.*, 2004 WL 2339759, *9–10 (S.D.N.Y.2004) (citing W. P. Keeton, *Prosser & Keeton on the Law of Torts*, § 112, at 791 (5th ed. 1984)) (additional citations omitted). Courts have specifically found statements published concerning an attorney which, on their face, are susceptible in their ordinary meaning of a construction that would tend to injure him in that capacity, are defamatory *per se*. *Kleeberg v. Sipser*, 191 N.E. 845, 846 (N.Y. 1934). Examples

Lieutenants or A **hole Captains..,."); 13 ("Flagrant's audience expects…"); 14 ("Flagrant aimed to ignite 'spirited debates' in which SONNEN was to deploy his 'signature style of trash talking.'"); 14 ("whose mission is to 'challenge[] political correctness" and aim is to blow off 'your dome piece'[.]"); 16 ("For the last 10 years, [Delgado] has made her living as a writer and TV News commentator."); 16 (Delgado "strategically drops bombshells" …"); 16 ("[Delgado] has voluntarily thrown her lawsuits into the public spotlight and made request on GoFundMe for financial contributions to support her litigation against both Miller and Trump.").

include those which show lack of character or a disregard of professional ethics. *See, e.g.*, *November v. Time, Inc.*, 194 N.E.2d 126 (N.Y. 1963) (allegations of infractions of professional ethics); *Levy v. Gelber*, 25 N.Y.S.2d 148, 149 (Bronx Co. 1941).

"At this [motion to dismiss] stage of the proceeding, where the plaintiff's allegations must be accepted as true and all reasonable inferences must be drawn in his favor…the Court's task is clear: to determine whether the statements at issue are 'reasonably susceptible of a defamatory meaning.'" *Treppel*, 2004 WL 2339759 at 10 (citation omitted). "If the Court deems the statements to be reasonably susceptible to a defamatory interpretation, then 'it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.'" *Id.* (quoting *James v. Gannett Co., Inc.*, 353 N.E.2d 834 at 837 (1976) (citation omitted)). Furthermore, since the Court must accept plaintiff's allegations as true for purposes of a motion to dismiss, "it assumes that defendants' statements are false and that defendants were culpable in making the statements." *Id.* (citations omitted).

In the Motion, Sonnen does not deny that he made the Defamatory Statements, that they were of and concerning Delgaldo, or that they were false. Instead, Sonnen argues that the Defamatory Statements are protected opinion and hyperbole that is not actionable because a reasonable viewer or listener of the Podcast would not conclude that any of the Defamatory Statements were verifiable fact. Aligning himself with Trump, who he refers to in the Motion as "[o]ur trash talker in chief[,]" Sonnen concludes that he can tell vicious, damaging lies about innocent individuals with impunity. Sonnen's argument is mind-boggling, particularly in light of the fact that his apparent hero—Trump—recently was found liable in this Court for his own "trash talking." *See Carroll v. Trump*, 22-cv-10016 (LAK). **Twice**. *See Carroll v. Trump*, 20-cv-7311; *see also Carroll v. Trump*, 2023 WL 4612082, *333-34 (S.D.N.Y. July 19, 2023).

Here, Sonnen's Defamatory Statements unequivocally are false and were presented by Sonnen as true—including, that Delgado did not go to Harvard Law School; that she does not have a law degree; that she used a fake name; and, that she stalked Sonnen and was banned from UFC events. The Defamatory Statements were not presented as opinions, could have been (and indeed were) understood by reasonable hearers as expressing assertions of provable fact about Delgado, and are not the type of rhetorical hyperbole that has been protected by Courts under the First Amendment. Such statements reasonably are susceptible to a defamatory interpretation.

Under New York law, three factors distinguish an actionable statement of fact from a non-actionable opinion: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact. *Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 334 (N.Y. Sup. Ct. 2022) (citation omitted). "Distinguishing between fact and opinion is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean" *Davis v. Boeheim*, 22 N.E.3d 999, 1005 (N.Y. 2014) (internal citations and quotation marks omitted). The pertinent inquiry therefore is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff." *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 253 F. Supp. 3d 705, 719 (S.D.N.Y. 2014) (citation omitted). "[I]f a statement is 'susceptible of different constructions, one of which is defamatory, resolution of the ambiguity is a question of fact for the jury.'" *Flowers v. Carville*, 310 F.3d 1118, 1128 (9th Cir. 2002).

Here, there can be no legitimate dispute that the Defamatory Statements have a precise

meaning which is readily understood. The segment in which the Defamatory Statements are made and published is titled "*Chael knew there was a phony in the President's inner circle*." FAC ¶30. Sonnen begins the segment by falsely stating that Delgado was stalking Sonnen, which is a crime under New York law.[6] FAC ¶25. To make this statement believable, Sonnen pads the statement with false support: that the chief legal officer of the UFC was notified of Degado's behavior and that notices were placed at every venue that Sonnen went to, banning Delgado from attendance. FAC ¶25. These statements are not ambiguous or capable of alternate interpretations—they mean precisely what they say—that Delgado is a stalker who was banned from UFC events, with "notices" about her placed at UFC venues. The implication, of course, is that Delgado was criminal and likely dangerous. Moreover, these statements can be proven true or false: Delgado either stalked Sonnen, or she did not; notices were either posted or they were not; and, she was either banned by the UFC, or she was not.

Next, Sonnen accused Delgado of being a "phony," of "not [being] who [she] claim[ed]" she was and describes her as "getting ready to set [] up" Trump. FAC ¶25. Again, Sonnen bolstered these allegations with provable falsehoods—that Delgado lied about her name, that Delgado's name was not what she said it was, that she did not have a law degree, and that she did not go to Harvard. These are not vague or ambiguous statements and there can be no dispute as to what they mean. These allegations also readily are capable of being proven true or false.

On the issue of the context, Sonnen asks this Court to find that the Defamatory Statements are not actionable because: (1) the term "stalking" is a familiar rhetorical device, of the "loose, figurative or hyperbolic" sort that are not actionable (Motion at 11); (2) the Defamatory Statements were published on social media—in this case a sophisticated YouTube show and channel with

[6] *See* N.Y. PEN § 240.26. It also is a crime where Sonnen resides, in Oregon. *See* 16 O.R.S. § 163.732.

millions of subscribers (Motion at 13); (3) Sonnen is a known liar (Motion at 14); and, (4) some fans of the Podcast would purportedly recognize the statements as hyperbolic, humorous and mere "trash talk" (*Id*.). Not only do many of Sonnen's arguments rely upon facts outside of the FAC, which the Court cannot consider on a motion to dismiss under Rule 12(b)(6), *see* above, but they also are incorrect as a matter of fact and law.

First, contrary to Sonnen's argument that "stalking" should be considered mere hyperbole, New York courts have found such allegations sufficient to state a claim for defamation. *See DeFilippo v. Xerox Corp.*, 223 A.D.2d 846 (1996); *see also Moraes v. White*, 571 F. Supp. 3d 77, 95 (S.D.N.Y. 2021) (holding former nanny stated a claim for defamation against former employer for statements on social media accusing nanny of stalking and harassment). In *DeFilippo*, the plaintiff accused his former employee of falsely stating that he had "stalked" his immediate supervisors. The court, holding that the plaintiff had sufficiently stated a claim for defamation, noted that stalking would constitute the crime of harassment under New York law, and was actionable. *Id.* at 849. Sonnen's statements on the issue did not stop with a mere allegation of "stalking." Instead, he supported the statement with fabricated specifics: that "the chief legal officer for Ultimate Fighting Championship had to put a notice at every venue that [Sonnen] went to, to ban this person who was stalking me." These are not "figurative" or "hyperbolic" statements.[7] The addition of these verifiable falsities make the statements unquestionably actionable as defamation. *See Zuckerbrot*, 167 N.Y.S.3d at 334*;* *Solstein v. Mirra*, 488 F.Supp.3d 86, 98

[7] Contrast this to the "accusations of 'extortion,' 'blackmail,' and related crimes," which "are often construed as merely rhetorical hyperbole when they are not accompanied by additional specifics of the actions purportedly constituting the crime" *See McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 182 (S.D.N.Y. 2020). "Indeed, in *McDougal*, "[t]he context in which the offending statements were made [ ] make it abundantly clear that [defendant] was not accusing [plaintiff] of actually committing a crime" []. Not so here." *Zuckerbrot* 167 N.Y.S.3d at 331-32.

(S.D.N.Y. 2020).[8] Moreover, when the "stalking" allegation is considered in combination with Sonnen's other verifiably false statements of fact—*i.e.*, that Delgado had to be banned from UFC events; that she lied about her name and her professional and educational background and pedigree; that she was a "phony" who was getting ready to set up a then President of the United States—it plainly may lead the hearer to draw an inference that is damaging to Delgado. *See Herbert v. Lando,* 781 F.2d 298, 307 (2d Cir. 1986) ("A combination of individual statements which in themselves may not be defamatory might lead the reader to draw an inference that is damaging to the plaintiff.").[9]

Second, the publication of the Defamatory Statements on the internet does not make them less actionable.[10] "Our 'broader social context'—a necessary element of the defamation analysis—suggests that online commentary is just as capable as print or broadcast media of inflicting the kinds of harm the defamation laws are designed to protect against. Indeed, online communications can spread more quickly, and to all corners of the world, than can print or broadcast media statements." *Eros Intern. PLC v. Mangrove Partners*, 2019 WL 1129196, *9 (Sup. Ct., N.Y. Cnty. 2019). While Sonnen attempts to characterize the Defamatory Statements as "heated rhetoric" "aimed to ignite 'spirited debate'" the truth is that these were unprovoked statements about a single

[8] *See also Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) ("[W]here the plaintiff alleges that both the opinions and facts are false, a motion to dismiss should not be granted, and the plaintiff may proceed against both the statements of fact and opinion.").

[9] *See also Partridge v. State of N.Y.*, 173 A.D.3d 86 (2019) (finding that defamation was implied when the placement of a photograph by the State Police of the plaintiff on a Facebook page suggested that the plaintiff had committed sex crimes against children when he had not).

[10] Although older cases suggested that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts," *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 2012 WL 3569952 (Sup. Ct., New York Cnty. 2012), "this observation, even if it is assumed to be true, should not be read to 'immunize [content] the focus and purpose of which are to disseminate injurious falsehoods about their subjects" *Sandals Resorts Int'l, Ltd. v. Google, Inc.*, 86 A.D.3d 32, 42-44 (1st Dept. 2011).

mother who presently lives a quiet, non-public life with her special needs son.[11] *See* FAC ¶3. The Defamatory Statements were published not just to the Podcast hosts, but to millions of YouTube subscribers and listeners.[12] The were presented as verifiable facts about Delgado. Under these circumstances, courts can and do find that such statements qualify as defamatory. *See, e.g.*, *Solstein*, 488 F.Supp.3d at 101-02 (statements made on social media accusing plaintiff of crimes could support a claim for defamation).[13]

Third, there is no such thing as a "MVP of trash talking" defense to defamation. That Sonnen may be a "spinner of tales" in some contexts (for example, "trash talking" UFC opponents) matters little as to whether his statements under *these* circumstances are actionable. Sonnen presented the Defamatory Statements to an audience of millions as verifiable facts. A reasonable person could—and frankly did[14]—understand the statements as conveying provable facts about Delgado.

Last, it is well-settled that "[t]he terms 'humor and comedy' are not and cannot be synonymous with the term 'opinion[.]'" *Frank v. Nat'l Broad. Co., Inc.*, 119 A.D.2d 252, 257 (1986). "As forms of expression, humor and comedy have never been held to be entitled to absolute or categorical First Amendment protection." *Id.* (citations omitted). Thus, "the mere assertion that

[11] This underscores a systemic problem with the Motion: Sonnen makes factual assertions that not only are not found in the FAC, but that are, in themselves, false. For instance, in an attempt to cast Delgado as a current "public figure," he suggests that Delgado is a "nationally known political commentator" and writer who "has regularly published commentary in a variety of publications...." These statements would be accurate if Sonnen were making them in 2016; since 2017, they are inaccurate.

[12] Sonnen also admits that he conveyed the same or similar false statements of fact to Trump or the Trump Campaign years earlier in 2016 for purposes of having Delgado removed from her position.

[13] *See also Gilmore v. Jones*, 370 F. Supp. 3d 630, 676 (W.D. Va. 2019) (alleged statements published on YouTube were false and defamatory); *Steele v. Goodman*, 382 F. Supp. 3d 403, 421 (E.D. Va. 2019) (statements by guest speaker in online videos, referring to founder of not-for-profit corporation as "serious con man" and calling his project a "serious fraud," held to be actionable for defamation per se).

[14] *See* FAC ¶31, n.8, n.9, n.10

a statement was meant to be funny does not automatically absolve the utterer" in a defamation case. *Salomone v. Macmillian Publ'g Co., Inc.*, 411 N.Y.S.2d 105, 109 (Sup. Ct. NY 1978).[15] Here, Sonnen attempts to characterize the Defamatory Statements as mere "trash talk" presented on the Podcast that *he alleges* is known for "its humorous, no holds barred entertainment and not to be professionally vetted statements of fact." Sonnen argues that the "objected to portion is less than 2 minutes long and is sandwiched between SONNEN's outrageous trash talking and storytelling which no one believes for a second." Motion at 14. Sonnen cites no factual support for these assertions and, in fact, the Defamatory Statements were believed by others. *See* FAC ¶31.

Sonnen's argument misses the entire point. Nothing about the segment indicates that Sonnen was stating anything short of verifiable, damaging facts about Delgado.[16] That the statements were made on an allgedly "humorous" Podcast is not dispositive. *See, e.g., Goldfarb v. Channel One Russia,* 663 F. Supp. 3d 280, 304-05 (S.D.N.Y. 2023) (statements on talk show found not to be "rhetorical hyperbole" where they expressed verifiable facts).[17] Here, Sonnen presents as

[15] See also *Triggs v. Sun Printing & Publ'g Assn.*, 71 N.E. 739 (1904). "[O]ne assaulting the reputation or business of another in [] public [] cannot justify it upon the ground that it was a mere jest, unless it is perfectly manifest from the language employed that it could on no respect be regarded as an attack on the reputation or business of the person to whom it related.")

[16] Although Sonnen describes the Defamatory Statements as mere "trash talk" of the type in which Sonnen is wont to engage, this is belied by the actual description of "trash talk" during the episode itself. At the top of the episode, Sonnen and the hosts discuss Sonnen's strategy and approach leading up to his UFC fight matches. Sonnen describes the importance that he puts on promoting a fight and creating a master plan to build a fight, which includes trash talking *opponents* to manufacture and control the narrative by creating a character and telling a story to increase the stakes. *See* Podcast, 1:07-7:16, *How to be a bad guy - be authentic*. That is the purpose of Sonnen's "trash talk." As an example, Sonnen describes an incident in which he accuses an opponent of confusing a bus for a horse and trying to feed the bus a carrot. *See* Podcast, 7:44-10:17, *Andrew's favorite piece of trashtalking*. This is very different from an unprovoked attack against an individual not engaged in UFC fighting or otherwise engaged with Sonnen. Delgado is not Sonnen's opponent. She is a single mother who has not had any relationship with Sonnen for years.

[17] *See also Held v. Pokorny,* 583 F. Supp. 1038, 1040 (S.D.N.Y.1984) (noting that while rhetorical hyperbole and vigorous epithets are expressions of opinion, "[a]ccusations of criminal or unethical activity ... are expressions of fact, as are allegations relating to one's professional integrity that are susceptible of proof") (footnotes omitted); *Trump v. Chi. Tribune Co.,* 616 F. Supp. 1434, 1435 (S.D.N.Y. 1985) ("[W]hen [] criticism takes the form of accusations of criminal or unethical conduct, or derogation of professional integrity in terms subject to factual verification, the borderline between fact and opinion has been crossed." (footnotes omitted); *Giffuni v. Feingold,* 299 A.D.2d 265 (2002) (statements alleging criminal conduct were not loose, figurative, or hyperbolic).

a thoughtful, retired athlete engaged in serious conversation, while sharing anecdotes from his career. During the episode, Sonnen mostly discussed serious topics, such as the boxing's legacy, CTE and brain injury, his wife, his thoughts on various fight match-ups and performance enhancing drugs, among other topics.[18] Even when delving into politics (discussing Bill Clinton, Barack Obama, his admiration for Donald Trump, *et cetera*.), or mysterious topics (the pyramids and the JFK assassination), Sonnen's tone and remarks remain tempered and serious. There is nothing fantastical or satirical about the episode or Sonnen's commentary that would lead a listener to conclude it is at all a farce.[19]

With regards to Sonnen's unprovoked attack on Delgado, there is no indication that Sonnen suddenly switched to false "trash talk" or is engaging in "rhetorical hyperbole." Certainly, there is nothing silly or nonsensical in stating that a person has used a false name or did not graduate from the law school she claims. Likewise, while the statements are extreme in that they accuse Delgado of being a stalker who lied about her name, her education, and her professional qualifications to set up a U.S. President, nothing in the segment suggests that Sonnen has engaged in gross exaggeration such that an average listener would conclude that Sonnen was not conveying actual facts. Indeed, an average listener can, and did, understand that Sonnen's statements as verifiable

[18] Although Sonnen characterizes the episode as nothing more than "outrageous commentary" (see Motion at 2) Sonnen fails to explain how or why his comments may be understood as fabrications. A plain listening of the episode reveals that while Sonnen was occasionally humorous (for example, referring to his 2010 federal plea deal for money laundering as having "robbed banks" ala "Robinhood, to help the poor"), *see* Podcast at 2:03-2:20 *"I used to rob banks" + Chael's wife + D. B. Cooper*), his overall tone and demeanor was thoughtful and not outrageous.

[19] As Sonnen points out in the Motion (Motion at 2), during the Podcast, in a different segment from the one in which Delgado is discussed, one of the hosts laughingly questions whether Sonnen is lying his way through the Podcast. *See* Podcast, 2:22:32-2:23:10, *George Santos is like any other politician*. Notably, despite this apparent recognition by the hosts that Sonnen was being untruthful, none of the hosts legitimately question the veracity of anything Sonnen says during the episode to convey a lack of veracity to their audience. Moreover, in response, Sonnen doubles down, stating that he is "not trying to lie" and "wasn't trying to lie" about the statements he made. *Id.*

facts about Delgado.[20] *See* FAC ¶31.

C. *The FAC Sufficiently Alleges Actual Malice*

Delgado does not concede that she is a public figure. As the FAC alleges, Delgado now lives a quiet life with her minor child. FAC ¶3. She no longer is employed by Trump or the Trump Campaign and dedicates most of her time to caring for her special needs son. FAC ¶3. It is an open question whether or when an individual who was once a public figure may lose that status by the passage of time. *Lee v. City of Rochester*, 174 Misc.2d 763, 774 (Sup. Ct. Monroe Co. 1997) (quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 (1979) (there is no per se rule that the passage of time will not necessarily change an individual's status as a public figure). In the Motion, Sonnen outrageously claims "[f]or the last 10 years [Delgado] has made her living as a writer and TV News commentator." Sonnen cites no facts in support of this statement, nor could he. It is false. Sonnen also alleges that Delgado "strategically drops bombshells" in her pregnancy discrimination case against the Trump Campaign "to insure [sic] that she remains prominent and relevant in the news." Again, Sonnen does not cite any facts in support of this allegation, because

[20] Cases cited by Defendants are inapposite or irrelevant. For example: *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970) involved the term "blackmail" used figuratively during public debates to characterize the position that had been taken in negotiations with city officials regarding land use, and was not an accusation of an actual commission of a crime. Reports of the public debate were published by a community newspaper. *Id.* at 13. The Supreme Court found that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole" and was not a charge of a criminal offense. *Id.* at 14. The Supreme Court noted that "if the reports had been truncated or distorted in such a way as to extract the word 'blackmail' from the context in which it was used at the public meetings, this would be a different case." *Id.* at 14.; *Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014) held that the word "extortion" when used in the heat of a nasty employment dispute where the accusation was made by agency's lawyer in a letter discussing the parties' employment dispute could not be read by a reasonable reader as an accusation of a crime; *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017), held that accusations that an individual engaged in "fraud" or "extortion" could not be read as an accusation of a criminal offense, but rather, contextually was merely the use of colorful language to describe a blogger's frustration similar to other language utilized throughout the post.; *Horsley v. Rivera*, 292 F.3d 695,697, 702 (11th Cir. 2002), held that talk show host's statement that doctor was accomplice to murder was non-literal rhetorical hyperbole where no reasonable viewer would have concluded that the statement was literally contending that the doctor could be charged with murder—in so holding the court considered the highly charged, emotion nature of the debate and the fact that the doctor himself acknowledged that he understood the host to be speaking in a figurative rather than literal sense as soon as the statement was made.

it is false. Nevertheless, Sonnen asserts the Court can take judicial notice of these unsupported falsehoods. However, on this record, this Court cannot make any determination as to Delgado's status as a public figure. *See Penobscot Indian Nation v. Key Bank*, 112 F.3d 538, 561–62 (1st Cir. 1997) (refusing to determine, as a matter of law, "public figure" status in a defamation action when presented with insufficient record evidence).[21]

As to Delgado's status as a limited purpose public figure, it is true that Delgado has been involved in lawsuits pertaining to pregnancy discrimination and child custody matters. However, "in order to establish that a plaintiff is a limited purpose public figure a defendant must show the plaintiff has: '(1) successfully invited public attention to [her] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [herself] into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.'" *Cummins v. Suntrust Capital Mkts., Inc.*, 649 F. Supp. 2d 224, 241 (S.D.N.Y. 2009). Sonnen does not identify what "public controversy" he claims Delgado voluntarily injected herself into and assumed a position of prominence in. The Motion merely states the alleged defamatory statements were made about Delgado in "her role as a public figure in politics." Motion at 16. This is insufficient. There is nothing in the record to suggest that at the time the Defamatory Statements were made there was any public controversy[22] about Delgado's former role as a public figure in politics. Moreover, the Defamatory Statements relate not to Delgado's role as a public figure in politics, but rather to whether she is a stalker, who was banned from UFC events and lied about her name and her law

---

[21] *See also Coleman v. Grand*, 523 F. Supp. 3d 244, 256 (E.D.N.Y. 2021) (holding that the defendant did not sufficiently demonstrate that the plaintiff had reached a "high level of celebrity and name recognition" and therefore cannot be classified as a general purpose public figure) ("[T]he Court requires a 'clear showing' of fame, asking whether he is a 'well-known celebrity' whose name is a 'household word.'") (internal quotations omitted).

[22] "A public 'controversy' is any topic upon which sizeable segments of society have different, strongly held views." *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 138 (2d Cir.1984).

degree. Before Sonnen made these statements, there was no controversy, public or otherwise, concerning what law school Delgado attended (*it was Harvard)* whether Arlene Delgado was her real name (*it is*), or whether she was banned by UFC (*she was not*). Because Sonnen cannot establish Delgado was, when he made the false statements, a public figure, the "actual malice" standard of defamation is irrelevant to Delgado's claims. *See Coleman*, 523 F. Supp. 3d 244 at 256 (holding the plaintiff was not a limited purpose public figure where there is no evidence the plaintiff successfully sought public attention and influence for his views on matters arguably related to this litigation).

But even if the Court finds Delgado is a public figure in some capacity, the FAC sufficiently pleads facts supporting actual malice. Actual malice requires "knowledge that [the statement] was false or ... reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). This test is subjective, not objective. Reckless disregard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Nonetheless, "[a]lthough actual malice is subjective, a court typically will infer actual malice from objective facts," *Celle*, 209 F.3d at 183 (internal quotation marks omitted), for actual malice "is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted," *Dalbec v. Gentleman's Companion, Inc*., 828 F.2d 921, 927 (2d Cir. 1987). A plaintiff can prove actual malice "'through the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence[.]'" *Celle*, 209

F.3d at 183 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)). "Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice." *Id.* At the pleading stage, the complaint must only "rais[e] a plausible inference of actual malice." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015).

Here, Delgado has alleged she and Sonnen were close friends for a period of about a year. FAC ¶11. Their relationship began when Delgado sought to interview Sonnen. FAC ¶12. Before agreeing to the interview, Sonnen asked to confirm Delgado was a Harvard graduate. FAC ¶13. Delgado responded publicly "To answer your question, it's 'yes,', of course!" and provided Sonnen with a link to her New York State Bar listing. FAC ¶13. In response, Sonnen agreed to be interviewed. FAC ¶14. During the course of their year-long close friendship, Sonnen referred to Delgado by the pet name "Harvard." FAC ¶16. There is no question that Sonnen was well-aware that Delgado's name was Arlene Delgado and she graduated from Harvard Law. Nevertheless, during the Podcast, Sonnen affirmatively states the opposite of what he knows to be true—that Delgado did not go to law school, that she lied about her name, and that she didn't attend Harvard. Delgado's claim is not that Sonnen failed investigate her background; it is that he knowingly lied about it to millions of people. Sonnen's attempt to characterize these false statements as misremembering facts is inconceivable. Notably, Sonnen does not bother to argue he somehow "misremembered" that Delgado stalked him or that she was banned from UFC events. Nor could he make such argument, as they were bald-faced lies. Additionally, the FAC sets forth facts demonstrating Sonnen's ill will and motivation for making the Defamatory Statements—namely, he carried a grudge after Delgado criticized his racially-charged remarks (FAC ¶ 50), he had a history of targeting on minorities such as Delgado (FAC ¶¶20, 48), and he had political aspirations

(as he admits on the Podcast) and hoped to curry favor in the Trump orbit by attacking Delgado (FAC ¶49). Why else would he drag Delgado's name and reputation through the proverbial mud out of the blue? The two former friends had not been in substantive contact for years and Delgado was living a quiet life out of the spotlight. Because Delgado has alleged Sonnen made the Defamatory Statements with reason to know they were false and did, in fact, know they were false when he made them, Delgado has sufficiently alleged raised a plausible inference of actual malice and the Motion should be denied.

D. *The FAC states a claim for Intentional Infliction of Emotional Distress*

Under New York law, a plaintiff claiming intentional infliction of emotional distress must plead four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996) (citation omitted). Conduct may be "extreme and outrageous" where "there is a deliberate and malicious campaign of harassment or intimidation." *Rich v. Fox News Network, LLC,* 939 F.3d 112, 122–23 (2d Cir. 2019) (citation omitted). The proper inquiry is not merely whether an individual act might be outrageous, but whether the action in totality amounted to a deliberate and malicious campaign. *Id.* at 123.

As pled in the FAC, Sonnen purposely and without provocation attacked Delgado and, by his own admission, has been doing so for years. First, Sonnen admits he contacted Trump to advise Trump that Delgado was a phony who was getting ready to set him up, who lied about her name, was not who she said she was, did not go to law school and did not go to Harvard. FAC ¶25. The apparent purpose was to have Delgado removed from her position which, according to Sonnen, resulted in Delgado's removal. FAC ¶25. Years later, apparently unsatisfied with his prior attempted destruction of Delgado's professional relationships and opportunities, Sonnen, again

without any provocation, spouts the same lies about Delgado, this time to millions of listeners of the Podcast. FAC ¶25. Thus, Sonnen has engaged in a what amounts to a multi-prong campaign to malign Delgado, damage her reputation, and destroy her economic opportunities. Sonnen's repeated statements, over the course of years, that Delgado, a licensed attorney, lied about her education, qualifications and even her name are particularly extreme, outrageous and damaging in light of her profession. Indeed, an attorney's reputation is one of her most valuable assets. Clients, other counsel and the Courts depend upon her veracity and truthfulness. The well-pled facts of the FAC, taken together, plausibly allege extreme and outrageous conduct on the part of Sonnen. *See Moraes*, 571 F. Supp. 3d at 105-06. Moreover, Delgado sufficiently has alleged extreme emotional distress caused by Sonnen's intentional actions against her. FAC ¶¶62-63.

E. *The FAC states a claim for Intentional Interference with Prospective Contracts*

The elements of a cause of action for tortious interference with prospective economic advantage are: (1) existence of a profitable business relationship; (2) the tortfeasor's interference with that relationship; (3) the tortfeasor's use of dishonest, unfair, improper, or wrongful means; and (4) damage to the business relationship. *Goldhirsh Group. Inc. v. Alpert,* 107 F.3d 105, 108–09 (2d Cir.1997).[23] Here, Delgado alleged she had a profitable business relationship with the Trump Campaign working as a senior advisor. FAC ¶3. While on the Podcast, Sonnen admitted that he contacted Trump and conveyed false statements—*i.e.* Delgado was a phony who was not who she was claiming to be, and did not go to the school she claimed—and, as a result, Delgado was removed from her position. FAC ¶25. Specifically, "[s]o I have to reach the president … to let them know that this human being is not who they're claiming they are, and they're getting ready to set you up. Not to mention, you're going to look like a fool when it comes out that this person

[23] Under New York law, defamation is a predicate wrongful act for a tortious interference claim. *See Stapleton Studios, LLC v. City of N.Y.*, 26 A.D.3d 236 (2006).

is not named, does not have the title, and did not go to the school that you're running around Hannity and Colmes and telling them that they are. ***And I did. I got it to the president who removed this person***[.]" FAC ¶26. The FAC therefore alleges sufficient facts to state a claim for tortious interference with prospective business expectancy.

In the Motion, Sonnen argues Delgado cannot prevail on her claim because she claimed pregnancy discrimination in connection with her not obtaining a position in the White House after her pregnancy was revealed. Motion at 22. Delgado's claims in a separate, pending lawsuit and the reasons for the cessation of her business relationship with Trump and the Trump Campaign are questions of fact not appropriate for resolution on a motion to dismiss.[24] At minimum, Delgado is entitled to engage in discovery as to whether Sonnen's outreach to Trump and his false statement of facts about Delgado to Trump interfered with her business relationships. The only question at this time is whether Delgado has stated a plausible claim for intentional interference with her prospective contracts with Trump and/or the Trump Campaign—she has. *See DiBlanca v. Town of Marlborough*, 2014 WL 2866341, *9 (N.D.N.Y. June 24, 2014) (allowing claim to proceed where "discovery" would reveal "the relevant information regarding" the loss of particular business).[25]

## CONCLUSION

In consideration of the foregoing grounds and the record herein, Delgado respectfully requests that this Court deny Defendant Sonnen's Motion to Dismiss in its entirety and, grant in favor of Delgado such other and further relief as this Honorable Court deems just and proper.

---

[24] And, indeed, two things can be true: that the Trump Campaign engaged in pregnancy discrimination, and also Sonnen caused the White House to kick Delgado to the curb through his falsehoods.

[25] *See also Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 263 (S.D.N.Y. 2023) (motion to dismiss denied where discovery could reveal the cause and extent of interference and harm arising from misconduct).

Dated: September 4, 2024

Respectfully submitted,

**Arlene Delgado**
By Counsel

/s/ *Timothy B. Hyland*
Timothy B. Hyland
NY Bar No. 5434493
HYLAND LAW PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel. (703) 956-3566
Fax (703) 935-0349
Email thyland@hylandpllc.com

/s/ *Jamie M. Hertz*
Jamie M. Hertz
*Pro Hac Vice*
HYLAND LAW PLLC
1818 Library Street, Suite 500
Reston, VA 20190
Tel. (703) 956-3566
Fax (703) 935-0349
Email: jhertz@hylandpllc.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 4th day of September, 2024, I electronically filed the foregoing by using the CM/ECF system, which will send copies thereof and a Notice of Electronic Filing to:

John C. Vasquez, Esquire
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036

Max N. Wellman, Esquire
VENABLE LLP
2049 Century Park East, 23rd Floor
Los Angeles, CA 90067

Claire F. Rush, Esquire
BARRY MCTIERNAN & MOORE, LLP
One Battery Park Plaza, 35th Floor
New York, NY 10004

/s/ *Timothy B. Hyland*
Timothy B. Hyland
NY Bar No. 5434493
HYLAND LAW PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel. (703) 956-3566
Fax (703) 935-0349
Email thyland@hylandpllc.com